IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL A. HUNT,

    Plaintiff,                            No. CIV S-04-0435 LKK JFM P

    vs.

COREY MCKAY, et al.,

    Defendants.                        FINDINGS AND RECOMMENDATIONS

_____/

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. In the sole claim remaining in this action,[1] plaintiff claims that his Fourteenth Amendment right to due process was violated when defendant Vance improperly placed plaintiff's name on a list of suspected or known Blood gang members, associates or sympathizers, causing plaintiff to be locked down for a period of twelve days. This matter is before the court on defendant Vance's July 19, 2006 further motion for summary judgment pursuant to Fed. R. Civ. P. 56. On January 25, 2007, plaintiff filed an opposition to the motion.

---

[1] On January 19, 2006, this court issued findings and recommendations recommending summary judgment for defendant Vance on this claim. By order filed March 27, 2006, the district court declined to adopt the findings and recommendations and remanded the matter to this court for further proceedings. Plaintiff's other claims were dismissed by orders filed March 7, 2005 and March 27, 2006. Specifically, plaintiff's Eighth Amendment claims against defendant Vance were dismissed on March 7, 2005.

SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

/////

On June 10, 2004, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

ANALYSIS

In the August 18, 2004 First Amended Complaint, which is unverified, plaintiff alleges defendant Vance violated his Fourteenth Amendment due process rights. Specifically, plaintiff contends defendant Vance failed to use the reliability procedures in place to properly validate plaintiff as a gang member before subjecting him to the lockdown at issue here. Plaintiff further alleges he "continues to suffer the stigmatizing effect of being labeled a gang member in prison," by both prison staff and inmates. (Id. at 9.)

In his motion for summary judgment, defendant Vance contends that he is entitled to summary judgment on plaintiff's Fourteenth Amendment claim because plaintiff's placement on lockdown status did not trigger a cognizable liberty interest. In the alternative, defendant Vance contends that he is entitled to qualified immunity.

I. Undisputed Facts[2]

At all times relevant to this action, plaintiff was incarcerated at California State Prison-Sacramento (CSP-Sacramento). Defendant Vance was a correctional captain employed at CSP-Sacramento.

On September 5, 2002, a member of the Blood gang was "attacked and cut" by at least two other Blood gang members. (Pl.'s January 25, 2007 Opp'n, Ex. C.) Following that incident, prison officials decided to temporarily lockdown, by confinement to their cells, all

/////
/////

---

[2] These facts are taken from the January 19, 2006 findings and recommendations (at 4-5) unless otherwise indicated.

4

inmates believed to be affiliated with the Blood gang.[3]  Members of defendant Vance's staff generated a list identifying suspected Blood gang members, associates, or affiliates.[4][5]  The list did not expressly identify the inmates on the list as Blood gang members.  It was a programming list generated pursuant to staff investigation of the September 5, 2002 incident.

Inmates whose name appeared on the list were locked down in their cells.  Plaintiff's name was on the list.[6]  As a result, plaintiff was placed on lockdown status for twelve days, from September 5, 2002 until September 17, 2002.

On October 30, 2002, an inmate grievance filed by plaintiff was granted in part by a correctional sergeant, who stated he had:

> conducted a review of your Central File and could not find any reference or documentation for your being listed as a member of the blood disruptive group or any other gang/disruptive group.  Accordingly, I have directed staff to change your designation on all yard listings as being non-affiliated.

/////

---

[3]  At no point during the time period at issue here was plaintiff held or transferred to the segregated housing unit.

[4]  Defendant Vance avers that he did not generate the list and that he has no personal recollection of seeing or approving the list before it was used to lock down inmates.  (Vance Declaration, at ¶ 11.)  He also notes that it does not bear his signature.  (Id.)  The list nonetheless plainly identifies defendant Vance as the prison official ordering the lockdown.  (Attachment E to Ex. B.)

[5]  In his opposition, plaintiff relied on defendant Vance's admissions that were earlier deemed admitted by defendant Vance's failure to timely respond.  However, by order issued herewith, the court granted defendant's motion to withdraw those admissions.  Plaintiff's reliance on the admissions, however, does not impact the resolution of the motion for summary judgment because the nature of the list contained in the February 4, 2002 memo was not at the heart of the requests in which the descriptions were included.  Rather, the specific requests in which the descriptions were included sought defendant's admissions concerning the creation, authorship or authorization to create the memo, which this court finds is not dispositive of the merits of this action.  (See footnote 4, above; order issued herewith.)

[6]  The list contains at least two typographical errors.  First, it is dated February 4, 2002.  That is an obvious typographical error, as the memorandum describes an incident that occurred in September 2002.  Second, the memorandum identifies the date of the incident as September 4, 2002.  It appears, however, that the incident at issue occurred on September 5, 2002.  The errors do not materially affect the matters at bar.

(Pl.'s January 25, 2007 Opp'n, Ex. G.)  In a memorandum dated December 5, 2002, the Warden of CSP-Sacramento noted that plaintiff's "non-affiliated status" had been confirmed and his "Blood disruptive group designation" had been removed from "all facility gang lists and picture board."  (Id.)

It is undisputed that plaintiff's confinement to his cell was administrative in nature; that is, his confinement was not based on a prison disciplinary or any alleged involvement in the stabbing incident that prompted the lockdown.

Defendant has provided a declaration by David Baughman, Correctional Captain, who declares under penalty of perjury that none of the inmates on the list included in the February 4, 2002 memo are validated disruptive group members.  Plaintiff claims this is a disputed fact; however, plaintiff has provided no evidence to the contrary.[7]

Facility captains, including defendant Vance, do not have the authority to validate an inmate as a gang member.  (Pl.'s January 25, 2007 Opp'n at 11 [Docket No. 59 at 14]; Deft.'s July 19, 2006 Stmt. Undisp. Facts at 3.)

III.  The February 4, 2002 Memo

The February 4, 2002 memo that contained the list of inmates placed on lockdown in response to the September 5, 2002 incident, states as follows:

> Memorandum
>
> Date:   February 4, 2002
>
> To:     All Staff and Inmates
>
> From:   California State Prison Sacramento, P.O. Box 290002, Represa, CA  95671
>
> Subject:  B FACILITY PROGRAM

---

[7] Plaintiff cites to the September 5, 2002 incident report, his own declaration, the February 4, 2002 memo itself, the September 12, 2002 memo, plaintiff's grievances and prison officials' responses and defendant's answer.  (Pl.'s January 25, 2007 Stmt. Disp. Facts, at 2.)  However, none of these documents specifically addresses the gang status of those inmates' names included in the February 4, 2002 memo.  Plaintiff has therefore failed to rebut defendant's evidence as to the gang status of those inmates.

1  On Wednesday, September 4, 2002, a melee occurred in B Facility
2  4 Block which resulted in several Black (Bloods) inmates receiving
   serious injuries. As a result, the following inmates will remain on
3  lock-down status until further notice:

4  . . . [List of 49 inmates, including plaintiff, divided by 6 cellblocks omitted here]

5  S.J. VANCE
   B Facility Captain

6  SJV/ARG
   cc:    T. GOUGHNOUR, AW-B
7         Canteen Manager/Trust
          Watch Commander
8         Clinic

9  (Pl.'s January 25, 2007 Opp'n, Ex. E.)

10  IV.  The September 12, 2002 Memo

11  The September 12, 2002 memo further clarifies the B Facility Program status

12  following the September 5, 2002 incident. This memo reads, in pertinent part, as follows:

13  Date:       September 12, 2002
    To:         ALL B FACILITY STAFF AND INMATES
14  From:       California State Prison-Sacramento, Represa, Ca. 95671
    Subject:    B FACILITY PROGRAM STATUS
15
    On August 22, 2002, an incident occurred on the B Facility 7
16  Block Mini Concrete yard and an incident occurred on the 2 Block
    Mini Concrete yard involving White and Hispanic inmates, and
17  numerous inmates received serious injuries. On Thursday,
    September 5, 2002, an incident occurred in 4 Block involving
18  inmates from the "Bloods" disruptive group, and an inmate
    received serious injuries. Based on these incidents, the following
19  program is in effect.

20  Effective Tuesday, September 17, 2002, "Bloods" will return to
    normal program.
21  . . . .

22  (Pl.'s Opp'n, Ex. F.)

23  V.  Due Process

24  Plaintiff argues that he was not afforded the process that was due to him before he

25  was validated as a gang member or, at a minimum, treated as a gang member, and placed on

26  lockdown for 12 days, lost visiting rights with his family members and had his name placed on

7

"gang" lists and picture board. Although the February 4, 2002 memo does not expressly state plaintiff was identified as a Blood member, liberally construing the document, which this court is required to do, an inference can be drawn that plaintiff was locked down based on some connection with the Blood gang, which inference is further supported by the grievance response that reflected prison officials had to remove plaintiff's name from gang lists and picture board once it came to light that plaintiff was unaffiliated.

        A.   Liberty Interest

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of life, liberty or property. Wilkinson v. Austin, 545 U.S. 209, 221 (2005). Those who seek to invoke the procedural protections of the Due Process Clause must establish that one of these interests is at stake. Id. "A liberty interest may arise from the Constitution itself . . . , or it may arise from an expectation or interest created by state laws or policies." Id.

The Supreme Court has held that "the Constitution does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." Id. at 222 (citing Meachum v. Fano, 427 U.S. 215, 225 (1976)); see also Rizzo v. Dawson, 778 F.2d 527, 530 (9th Cir.1985) ("An inmate's liberty interests are sufficiently extinguished by his conviction so that the state may change his place of confinement even though the degree of confinement may be different and prison life may be more disagreeable in one institution than in another.") (citation omitted). However, a prisoner may have a liberty interest pursuant to state law. See Sandin v. Conner, 515 U.S. 472, 481-84 (1995).

Under state law, the existence of a liberty interest created by prison regulations is determined by focusing on the nature of the deprivation. See id. Such interests are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. In Sandin, the Court concluded that a prisoner had no liberty interest against a 30-day assignment to segregated confinement because the assignment did not "present a dramatic departure from the basic conditions of [the inmate's]

8

sentence." Sandin, 515 U.S. at 485; cf. Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987) (initial confinement in administrative segregation on the basis of little, even unsubstantiated information, does not create objectionable condition). In contrast, in Wilkinson, the Court held that indefinite placement of an inmate in a Supermax prison imposed an atypical and significant hardship on inmates in relation to the ordinary incidents of prison life because it prohibited almost all human contact, required constant lighting, allowed exercise for only one hour per day, was an indefinite placement, and disqualified an otherwise eligible inmate from parole. See Wilkinson, 545 U.S. at 209.

In the instant case, it is undisputed that plaintiff was confined to his cell, not transferred or placed in administrative segregation. Given plaintiff's period of confinement to his cell and the other minimally intrusive consequences, it is unlikely plaintiff had a liberty interest protected by the Due Process Clause of the Fourteenth Amendment. The United States Constitution does not create a liberty interest in inmates' ability to leave their cells for some period of time each day. See, e.g., Hewitt v. Helms, 459 U.S. 460, 466-68 (1983); Johnson v. Moore, 948 F.2d 517, 519 (9th Cir.1991) (per curiam) (prison policy dictating that all inmates not working or attending classes must be confined to their cells during the day did not violate Due Process Clause). Moreover, during a prisonwide emergency lockdown, a California prisoner has no protected liberty interest, and therefore has no due process right to notice or a hearing. Hayward v. Procunier, 629 F.2d 599, 603 (9th Cir.1980), cert. denied, 451 U.S. 937 (1981).

Here, plaintiff's twelve day confinement to his cell is more similar to the 30-day administrative segregation that was held to not be a protected liberty interest in Sandin than the indefinite Supermax placement in Wilkinson. Plaintiff has not articulated conditions even approaching those present in Wilkinson. Plaintiff's 12 day lockdown was not a dramatic departure from basic prison conditions as contemplated by Sandin. Confinement to a cell and deprivation of commissary, recreation, and visitation privileges for a period of twelve days is not a harsh imposition; inmates in administrative segregation might expect such conditions for longer

9

periods of time.[8]  While it is not pleasant to be confined to a cell, being so confined for the period alleged in plaintiff's complaint is not atypical in relation to the ordinary incidents of prison life. Indeed, inmates in the general population experience "significant amounts of 'lockdown time.'" Sandin, 515 U.S. at 486 (a short duration of segregation does not work a major disruption in an inmate's environment).

Moreover, unlike Wilkinson, plaintiff has failed to present any evidence that the other consequences of his confinement to his cell imposed an "atypical and significant hardship." See Sandin, 515 U.S. at 484.  Even assuming plaintiff's inclusion on the February 4, 2002 list caused defendant to treat plaintiff as if he were a validated gang member, it is undisputed that this treatment lasted 8 days.  It is also undisputed that this treatment was in response to exigent circumstances, the September 5, 2002 stabbing incident.  Violent incidents in prison are fairly common; prison officials must take action to ensure no further violent episodes occur and to protect any inmates prison officials believe may be involved.  Thus, a programming list that only raises a possible inference that those named in the list are somehow connected to the Blood gang is not atypical in relation to the ordinary incidents of prison life.

In light of the district court's order of March 27, 2006, the court will proceed as if plaintiff might have a protected liberty interest.

/////

/////

---

[8] For example, in Sandin, the majority found that Inmate Conner was not subjected to atypical or significant hardship in relation to the ordinary incidents of prison life.  It compared the eight hours' out-of-cell time that most inmates had with the 50-minute period that Conner had for shower and exercise and found those conditions to be similar.  Conner was held in disciplinary segregation for thirty days.  During his 50-minute out-of-cell periods, Conner "remained isolated from other inmates and was constrained by leg irons and waist chains." See Sandin, 515 U.S. at 494 (Breyer, J., dissenting).  In other words, fifty minutes' release and constant isolation from other inmates for a period of thirty days was not atypical or significant in comparison to eight hours' release and the companionship of a cellmate and others on the block.  Therefore, plaintiff's confinement to his cell for twelve days was not atypical or significant in comparison to the more usual release.

B. What Process Is Due

Assuming plaintiff had a liberty interest in being free of confinement to his cell, the court must determine what process plaintiff was due. Plaintiff argues he was entitled to process prior to being treated as a gang member, and that defendants did not comply with those or with any lesser procedures required before validating or treating him as a gang member.

What process is constitutionally due to an inmate placed in segregation depends on whether the placement is disciplinary or administrative. Toussaint v. McCarthy, 801 F.2d 1080, 1099 (9th Cir. 1986). In Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003), the Court of Appeals determined that California's policy of placing suspected gang members in segregation is an administrative decision, undertaken to preserve order in the prison. When an inmate is placed in segregation for administrative purposes, due process requires only the following procedures:

> Prison officials must hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated. The prison officials must inform the prisoner of the charges against the prisoner or their reasons for considering segregation. Prison officials must allow the prisoner to present his views. . . . [D]ue process [ ] does not require detailed written notice of charges, representation by counsel or counsel-substitute, an opportunity to present witnesses, or a written decision describing the reasons for placing the prisoner in administrative segregation.

Toussaint v. McCarthy, 801 F.2d at 1100-01 (footnote omitted).

By contrast, in the gang validation context, an inmate is entitled to another layer of informal procedures. Before being removed from general population, the inmate must "receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." Hewitt v. Helms, 459 U.S. 460, 476 (1983). When an inmate is validated as a gang member, the actual decision to segregate is made by the IGI. Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990); see also Madrid v. Gomez, 889 F.Supp. 1146, 1276 (N.D. Cal. 1995) (the critical decision maker is the IGI).

/////

1         Because plaintiff's confinement to his cell was administrative in nature, prison officials were not required to provide plaintiff with notice prior to his lockdown. Plaintiff discovered he had been put on the list included in the memo dated February 4, 2002 on September 6, 2002, and filed an administrative grievance on September 9, 2002, four days after the lockdown was implemented on second watch. (Ex. J to Plaintiff's Declaration, filed December 15, 2005, at 52.) By memo dated September 13, 2002, plaintiff's appeal was partially granted and staff was directed to change plaintiff's designation on all yard listings as being non-affiliated. (Pl.'s January 25, 2007 Decl., Ex. G.)

    Thus, the February 4, 2002 memo served as notice. As noted above, when an inmate is segregated for administrative rather than disciplinary reasons, the notice given may be much less specific, indeed may consist only of the "reasons for considering segregation." Toussaint v. McCarthy, 801 F.2d at 1100-01. Plaintiff was then able to file a grievance, protesting his lack of ties to the Blood gang. Eight days after plaintiff was confined to his cell, his administrative grievance was partially granted and he was removed from the gang lists and picture board.[9] Prison officials confirmed that his central file reflected he was nonaffiliated and there was no mention that he had been validated as a gang member.

    Plaintiff also claims the memo dated February 4, 2002 can be used to validate him as a gang member, a statement defendant disputes. However, there is no evidence that this memo has been used to validate plaintiff as a Blood gang member. Indeed, the undisputed evidence demonstrates that plaintiff is presently regarded as unaffiliated and is not validated as a Blood

/////

---

[9] Neither party has provided evidence specifically describing these gang lists or picture boards from which plaintiff's name was removed. Neither party has identified where these lists or pictures were posted or how they were used by prison officials. However, Lt. Reed stated that the list contained in the February 4, 2002 memo was "provided staff on all shifts (day, swing and graveyard) to know which cells to open and permit the occupant to leave. (Reed Decl., filed June 15, 2005, at 5.) Plaintiff has not provided any lists other than the list included in the February 4, 2002 memo.

gang member. Should prison officials attempt to use this memo in the future, plaintiff may seek redress from the courts at that time.

Plaintiff has provided no evidence that his confinement to his cell was based on subterfuge or an effort to validate plaintiff as a Blood member without the required due process. Rather, the record reflects that the inmates on the list were confined to their cells while an investigation ensued. Indeed, the September 12, 2002 memo noted that an earlier altercation involved White and Hispanic inmates, and amended programming again based on the September 5 incident as well as the earlier incident. Thus, the February 4, 2002 memo, taken together with the September 12, 2002 memo, demonstrate that prison officials were reacting to violent incidents in the prison and attempting to alter programming to protect the inmates and the staff. This is further bolstered by defendant Vance's declaration that in response to violent incidents,

> anyone may be locked down, whether a validated gang member, a validated gang associate, an inmate who might be sympathetic to a gang, group of inmates or another inmate or someone who might be considered a loaner (sic). If it is suspected that a person may become involved in the incident (e.g., acting to retaliate against another inmate, protect another inmate, become a victim, or in any other way react and get caught up in the incident after it happens), that person will be placed on temporary lockdown until staff is confident, to the extent possible, that no further incident will occur.

(Deft.'s Stmt. Undisp. Facts, Ex. B, at 2.) The evidence also reflects that once prison officials were made aware that plaintiff was unaffiliated, steps were taken to correct any inclusion of plaintiff on gang lists and picture board.

Therefore, even assuming plaintiff has a liberty interest in not being confined to his cell, plaintiff was provided all the process he was due under the circumstances.

C. Evidentiary Support For Confinement to Cell

In Bruce v. Ylst, 351 F.3d at 1287, the Ninth Circuit held that a determination that a CDC inmate is a gang member, and therefore appropriate for assignment to an indefinite term in segregated housing, must be supported by "some evidence." The requirement of "some evidence" sets a low bar, consistent with the recognition that assignment of inmates within

prisons is "essentially a matter of administrative discretion," subject to "minimal legal limitations." Id. (citing Toussaint v. McCarthy, 801 F.2d 1080, with respect to the minimal limitations). Even just one piece of evidence may be sufficient to meet the "some evidence" requirement, if that evidence has "sufficient indicia of reliability." Id. at 1288; Cato, 824 F.2d at 705 ("relevant question is whether there is *any* evidence in the record that *could* support the conclusion reached by the disciplinary board" (citing Superintendent v. Hill, 472 U.S. 445, 455-56 (1985)); Toussaint, 926 F.2d at 803 (articulating "sufficient indicia of reliability" standard). In Bruce, for example, the court noted three pieces of evidence supported the identification of the plaintiff in that case as a gang member: a sheriff's department report that plaintiff was a gang associate; a probation report indicating that plaintiff's codefendant on the underlying charge had been validated as a gang member; and a statement from a confidential informant. Bruce, 351 F.3d at 1288. The court noted that "any of these three pieces of evidence would have sufficed to support the validation because each has sufficient indicia of reliability." Id.

Defendant contends that plaintiff was confined to his cell under the exigent circumstances of the stabbing incident for the protection of plaintiff, other inmates and prison staff. Plaintiff "was suspected of being involved in the stabbing because of his grouping with Bloods on the yard." (Lt. Reed Decl., filed June 15, 2005, at 5.) Plaintiff appears to argue that no evidence supports a finding that he was somehow connected to the Blood gang because his status was unaffiliated and he had not been validated as a Blood gang member. However, plaintiff's gang status is not dispositive on the issue of whether prison officials' decision to confine him to his cell was supported by some evidence. Under the exigent circumstances of a prison stabbing, prison officials are granted wide discretion to take actions they deem appropriate to protect the inmates and prison staff from further violence. There is no express constitutional prohibition against "mass punishment" or "lockdown." See, e.g., Hayward v. Procunier, 629 F.2d 599, 600-03 (9th Cir.1980) (five-month lockdown did not violate Due Process Clause or Eighth Amendment). Prison officials are not required to forego all disciplinary or restrictive measures

merely because they are able or unable to identify individual miscreants.[10]  Courts should give prison officials wide latitude to address issues of prison administration.  The Supreme Court has explained the reason for this latitude:

> Prisons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent, conduct.  Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others.

Hudson v. Palmer, 468 U.S. 517, 526 (1984).  Plaintiff's claim that prison officials did not have adequate evidence to substantiate their allegations of gang membership lacks merit.  See Toussaint, 801 F.2d at 1105 ("the exigencies of prison administration allow prison administrators to make segregation decisions on the basis of 'some evidence,' including the administrator's experience and awareness of general prison conditions").

Thus, under the very lenient "some evidence" standard, plaintiff's due process rights were not violated.  Prison officials' decision to confine plaintiff to his cell was supported by the exigencies of the September 5, 2002 stabbing incident.

Accordingly, defendant's motion for summary judgment should be granted.

IT IS HEREBY RECOMMENDED that defendant Vance's July 19, 2006 motion for summary judgment be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen days after being served with these findings and recommendations, any party may file written

---

[10] See, e.g., Stewart v. Alameida, 418 F.Supp.2d 1154 (N.D. Cal. 2006)(gang validation is not limited to those "individuals who have engaged in gang-related violence or other disruptive conduct . . . .  And as Justice Kennedy observed, gang-related violence cannot easily be deterred by *ex post* sanctions.  In the prison context, . . . an ounce of prevention is worth a pound of deterrence."  Id. at 1164.  The exigencies of a prison emergency may require prison officials to lock down those at risk for the safety of the inmates and the institution.

1 objections with the court and serve a copy on all parties.  Such a document should be captioned
2 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised
3 that failure to file objections within the specified time may waive the right to appeal the District
4 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
5 DATED:  March 2, 2007.

_____
UNITED STATES MAGISTRATE JUDGE

001
hunt0435.msj2